GLENN S. LEON
Chief, Fraud Section
Criminal Division, U.S. Department of Justice
THEODORE M. KNELLER
Trial Attorney, Fraud Section
Criminal Division, U.S. Department of Justice
D.C. Bar No. 978680
1400 New York Avenue, NW
Washington, DC 20530
Telephone:    (202) 514-5799
E-mail:          Theodore.Kneller@usdoj.gov

*Attorneys for the United States*

**UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>       v.<br><br>DAVID LEE KAGEL,<br><br>       Defendant. | Case No. 2:24-cr-00024-GMN-DJA<br><br>**Government's Sentencing Memorandum** |

      David Kagel is a fraudster and a serial liar.  Over the course of a 56-year legal career, he abused his position of trust.  Kagel violated his oath to conduct himself with integrity and to faithfully discharge his duties as a lawyer.  He shamefully used his position as an attorney to dupe and defraud trusting victims of their life savings.  He did it for one reason: *greed*.

      On May 24, 2024, Kagel pleaded guilty to one count of conspiracy in violation of 18 U.S.C. § 371 for conspiring to execute a multi-year, multimillion dollar cryptocurrency Ponzi scheme.  The Presentence Report correctly calculates Kagel's guideline offense level to be 31.  (ECF 28 at ¶ 88, hereinafter "PSR.")  Thus, Kagel's imprisonment guideline range is 108 to 135 months, which is capped by a 60-month statutory maximum sentence.

(PSR at ¶ 114.) Kagel is 86 years old, and he claims to be in ailing health. Notwithstanding his age and health, the Court should impose a sentence that adequately addresses the seriousness of his crimes, which have inflicted life-altering financial damage and immense emotional anguish on his victims. Based on defendant's age and reported failing health, (both being factors indicative of a low likelihood of recidivism), the government agrees with the U.S. Probation Office's (USPO) recommendation to impose a below guidelines sentence of 5 years' probation. (PSR at ¶ 166.) But in consideration of the seriousness of the offense, the government recommends the Court also require home confinement (unmonitored) as a condition of probation. Home confinement is also consistent with the PSR's recommendation. (*See* PSR at ¶ 165; "Although the egregious actions of this defendant should not be minimized or understated, an alternative form of punishment, such as … home confinement, might be equally efficient and less costly than incarceration.")

## I.  RELEVANT PROCEDURAL HISTORY

On June 28, 2023, the government charged defendant in the Central District of California by information with one count of conspiracy to commit commodity fraud, in violation of 18 U.S.C. § 371. *United States v. Kagel*, 2:22-cr-00276-DSF, Dkt. 1 (C.D. Cal. June 28, 2023). The parties simultaneously filed a plea agreement to resolve the sole conspiracy charge. *Id.* at Dkt. 6. Separately, a twelve-count superseding indictment for the same scheme is pending in the Central District of California against defendant's coconspirators, David Saffron and Vincent Mazzotta. *United States v. Saffron, et al.*, 2:22-cr-276-DSF, Dkt. 101 (C.D. Cal. Dec. 7, 2023).

On January 30, 2024, defendant, the U.S. Attorney for the Central District of California, and the U.S. Attorney for the District of Nevada consented to transfer and

dispose of defendant's case by guilty plea in this District pursuant to Rule 20 of the Federal Rules of Criminal Procedure. (ECF 1.) On May 28, 2024, defendant entered a plea of guilty at a hearing before this Court. (ECF 24.) Defendant is not in custody and is currently released pursuant to conditions set by the Court. On August 30, 2024, the USPO filed a final PSR. (ECF 28.) Defendant's sentencing hearing is scheduled for October 7, 2024.

## II.   THE OFFENSE CONDUCT

### A. Relevant Conduct

Starting in January 2018, Kagel (then 79 years old) and his coconspirator, David Saffron (45 years old), began to fraudulently solicit and accept victims' cash, Bitcoin, and other cryptocurrency investments in an elaborate Ponzi scheme. All told, Kagel, Saffron, and their coconspirators defrauded victims of at least $20,000,000. (PSR at ¶ 23.) According to Kagel, he has known Saffron since he was a young child, is a long-time friend of the Saffron family, and has represented Saffron as his attorney since 2001.[1]

In January 2017, Saffron met with numerous groups of potential investors to promote his artificial intelligence robot or "AI-Bot." Saffron falsely claimed to have developed the AI-Bot to conduct automated, high-frequency trading on cryptocurrency markets across the globe. Saffron told potential investors that his AI-Bot executed 17,500 per hour, could generate profits of up to 600%, was more advanced than IBM's AI "Watson" (known for winning the TV gameshow Jeopardy), and made profitable trades 76% of the time.[2] But Saffron did not have an AI-Bot to trade cryptocurrency. He made it up, and Saffron and Kagel stole the investors' money. Saffron falsely promised that

---

[1] *CFTC v. Saffron et al.*, 2:19-cv-1697, Dkt. 101-3 at ¶ 10 (D. Nev. Mar. 2, 2021) (Decl. of David Kagel).
[2] *United States v. Saffron*, 2:22-cr-276, Dkt. 1 at ¶¶ 20-26 (C.D. Cal. Jun. 28, 2022) (Initial Indictment).

3

potential investors would earn fast, high-yield returns (guaranteed to double one's investment within 30 days) and falsely promised that all investments had zero risk of loss.

1. <u>Kagel and Saffron Provided Victims Letters on Law Firm Letterhead Falsely Promising 1,000 Bitcoin Held in Kagel's Escrow Account to Guarantee Against Any Investment Loss</u>

Instrumental to Saffron's pitch to induce victim-investors was a false promise that Kagel, as Saffron's attorney, held 1,000 Bitcoin (approximately $11 million) for Saffron "in escrow." Saffron and Kagel used defendant's position as an attorney to establish a false sense of trust with the victims. Saffron and Kagel misled victims to believe that Kagel held the 1,000 Bitcoin in an attorney escrow account that would "guarantee" victims' investments with Saffron. Saffron and Kagel falsely promised victims that there was zero risk of loss for their investments.

To convince victims to invest, Kagel provided victims "escrow" or "guarantee" letters on Kagel's law firm letterhead, which promised to repay victims in the event of loss. (*See* Exhibit 1, attached hereto.) At the end of Saffron's sales pitch, he often called Kagel on the phone and allowed victims to confirm that Kagel truly had a 1,000 Bitcoin wallet from Saffron. (PSR at ¶ 35.) But the 1,000 Bitcoin wallet was a sham. Kagel provided letters to at least 21 victims between January 7 and January 21, 2018. (*See* Exhibit 1.) Saffron and Kagel stole each victim's investment.

On January 23, 2018, Saffron was arrested in Los Angeles on an outstanding warrant from Georgia for financial fraud related charges. (PSR at ¶ 47.) When Saffron became unreachable, several victims became suspicious of Saffron and Kagel's investment scheme. When confronted, Kagel lied to cover for Saffron to keep the fraud going. Saffron remained in police custody for the next 24 days while he was transported to Atlanta.

During Saffron's incarceration, a group of Kagel's victims, who had collectively invested 206.5 Bitcoin (approximately $3.35 million), hired an attorney to obtain a refund of their investment from the 1,000 Bitcoin that Kagel purportedly held in escrow. (PSR at ¶ 49.) Kagel falsely responded that the victims could not be immediately repaid because Saffron disabled all access to the 1,000 Bitcoin escrow wallet during a robbery attempt. According to Kagel, Saffron disabled the wallet, "*at the risk of his life*," to prevent the assailants from stealing investors' Bitcoin. (*See* Exhibit 2, attached hereto.) Kagel explained that after the robbery, Saffron was arrested on an unrelated "relatively minor matter," but Kagel assured victims that Saffron would repay all his investors following his release from jail. (*Id.*; PSR at ¶ 51.) Kagel and Saffron's victims never received their investments back.

In early February 2018, victims posted negative comments accusing Saffron of stealing Bitcoin on consumer whistleblower websites, including ripoffreport.com. (PSR at ¶ 50.) The online reports threatened the success of Saffron and Kagel's scheme because accusations that Saffron was a fraud could be found through a simple Google search. Thus, on February 23, 2018, Kagel prepared another nearly identical letter purporting to guarantee investors' investments with 1,500 Bitcoin held in escrow. But this time Kagel changed the name of the trader from "David Saffron" to "David Gilbert" to conceal Saffron's true identity from new potential victims. (PSR at ¶ 52.) (*See* Exhibit 3, attached hereto.)

        2. <u>Kagel Lied to Victim H.C. to Conceal that Saffron Had Been Arrested for Fraud</u>

Victim H.C., who had invested $200,000, also reached out to Kagel while Saffron was still in jail. Victim H.C. was concerned that she could not reach Saffron to discuss her investment. Kagel lied to victim H.C. He told her that Saffron was unavailable to answer questions about her investment because he had been attacked and was in the hospital

recovering. But Kagel knew Saffron was in police custody and not in the hospital. (PSR at ¶ 48.) After his release, Saffron lied on a Zoom conference call to a group of victim-investors, including Victim H.C. Saffron told the victims that he had been unreachable in early February 2018 because he suffered a head injury during a robbery and doctors had to place him in a "medically induced coma."[3] This was a lie; Saffron had been in jail, not the hospital.

Subsequently, on June 1, 2018, Victim H.C. sued Saffron and Kagel for fraud.[4] On August 8, 2018, Saffron and Kagel entered into settlement agreement to pay $175,000 to resolve the lawsuit. But Saffron and Kagel negotiated in bad faith and did not pay the settlement as agreed. Victim H.C. had to file an amended complaint to enforce the settlement and obtain a default judgment.[5]

### 3. Kagel Continued to Promote the Fraudulent Scheme After He Had been Personally Sued for Fraud and Kagel Knew that the CFTC was Investigating Saffron for Operating a Ponzi Scheme

Between April and December 2018, Saffron laundered more than $250,000 of victims' Bitcoin investments through various intermediaries to Kagel's IOLTA bank account, which Kagel knew were proceeds derived from the fraudulent scheme. (PSR at ¶ 55.) In February 2019, the U.S. Commodity Futures Trading Commission (CFTC) took Kagel's testimony in connection with the agency's investigation of Saffron and Kagel's illegal Ponzi scheme. (PSR at ¶ 57.) On March 30, 2019, after providing on-the-record testimony, Kagel wrote back to the CFTC and claimed that (i) the $250,000 that he received

---

[3] *United States v. Saffron & Mazzotta*, 2:22-cr-276, Dkt. 101 at ¶ 23 (C.D. Cal. Dec. 7, 2023) (Superseding Indictment).
[4] *Charlston, et al., v. Saffron & Kagel*, No. BC 708601 (Cal. Super. Ct. L.A. Cnty. Jun. 1, 2018) (Compl.).
[5] *Charlston, et al., v. Saffron & Kagel*, No. BC 708601 (Cal. Super. Ct. L.A. Cnty. Aug. 29, 2018) (Amended Compl.).

6

from Saffron was not from victims but repayment for a loan from years ago, (ii) he was "truly shocked" to learn that Saffron was operating a Ponzi scheme, and (iii) he wished to assist the CFTC with its ongoing investigation. (*See* Exhibit 4, attached hereto.) These were all lies.

On September 30, 2019, the CFTC charged Saffron by civil complaint with operating a Ponzi scheme in U.S. district court, and on December 6, 2019, the district court ordered that Saffron's assets be frozen. (PSR at ¶¶ 59-60.) To conceal Saffron's assets from the CFTC and the district court, Kagel wired nearly $120,000 between May and July 2020 to a bank account held in the name of a company in which Saffron was an account signatory. The company was owned by Saffron and Kagel's coconspirator, Vincent Mazzotta. From June to August 2020, Kagel also wired Saffron dozens of payments totaling $78,000 via peer-to-peer smartphone payment applications. (PSR at ¶¶ 61-63.)

Fully aware that Saffron was a fraud and that the CFTC had sued Saffron, Kagel recruited Victim S.B. in July 2020 to invest with Saffron. Kagel falsely claimed that Saffron was a successful cryptocurrency trader who made substantial returns for investors. (PSR at ¶¶ 67-68.) Kagel used his position as Saffron's attorney to lull Victim S.B. into false sense of trust. Kagel omitted to tell Victim S.B. that Saffron and Kagel had settled a lawsuit for defrauding Victim H.C. or that a California Superior Court for Los Angeles County entered a default judgment against Kagel and Saffron for failing to pay the $175,000 settlement. *Id.* Similarly, Kagel omitted to tell Victim S.B. that the CFTC had charged Saffron with violations of the Commodity Exchange Act for operating an illegal Ponzi scheme.

After Victim S.B. invested the equivalent of $375,000 with Saffron, he became concerned about Saffron's honesty and trustworthiness. Kagel again used his position of trust as a lawyer to allay Victim S.B.'s fears and to prevent him from acting on his concerns.

7

From September 2020 through March 2021, Kagel stayed in contact with Victim S.B. and continued to falsely assure him that Saffron would ultimately pay Victim S.B. back. *Id.*

While Kagel continued to lull Victim S.B. from acting on his concerns about Saffron, Kagel filed a declaration in the CFTC litigation containing numerous false statements. (*See* Exhibit 5, attached hereto.) For example, Kagel falsely claimed the $120,000 transferred to Saffron between May and July 2020 was merely a loan from Kagel to Saffron and not laundered proceeds of fraud. *Id.* Furthermore, Kagel falsely claimed that he had "never been involved with" any "aspect of Mr. Saffron's Bitcoin business, either as a customer, investor, or any other." *Id*. But this was not true. Kagel played an integral role in recruiting and inducing nearly two dozen victims to invest millions of dollars into the Ponzi scheme in which Saffron played the frontman. Kagel stopped responding to Victim S.B. after the district court entered a default judgment for the CFTC on March 29, 2021.

B. <u>Other Relevant Information for Sentencing[6]</u>

Kagel is no stranger to defrauding the public and his clients, which he has done time and again over the course of his 56-year career as an attorney. In 1994, for example, a federal district court granted, in part, the U.S. Securities and Exchange Commission's motion for summary judgment that Kagel violated the antifraud provisions of the federal securities laws in connection with a company initial public offering. *SEC v. David Kagel, et al.*, 2:93-cv-855, Dkt. 60 (C.D. Cal. Jan. 31, 1994). The SEC prevailed on the unresolved charges at trial, and the district court entered a judgment against Kagel permanently enjoining him from further violations of the antifraud provisions of the federal securities

---

[6] Unless otherwise provided by law, there is no limitation placed on the types of information that the Court may consider concerning the background, character, and conduct of the defendant for the purpose of imposing an appropriate sentence. *See* 18 U.S.C. § 3661; *see also* U.S.S.G. § 1B1.4.

laws. (PSR at ¶¶ 94-97.) The California State Bar subsequently suspended Kagel's law license for six months for making materially false statements in a registration statement filed with the SEC and making false representations to SEC investigators to conceal his own actions.[7]

In 2012, the California State Bar suspended Kagel's license again for willfully misusing client funds in his IOLTA account.[8] Notably, Kagel engaged in similar patterns of money transfers through his IOLTA account as he did with Saffron in 2018, including depositing $100,000 of non-client funds into his IOLTA account and withdrawing the $100,000 on the same day. *Id.* The California State Bar finally disbarred Kagel in 2023 for defrauding a client and stealing $25,000 that Kagel held in escrow on behalf of the client.[9] (PSR at ¶¶ 130-132.)

### III. ADVISORY SENTENCING GUIDELINES CALCULATION

Pursuant to the plea agreement, Kagel pleaded guilty to one count of conspiracy to commit commodity fraud, in violation of 18 U.S.C. § 371 (Count 1). (ECF 22.)

As part of the plea agreement, the parties stipulated the following sentencing factors are applicable to determining the offense level:

| | | |
|---|---|---|
| (i) | a base offense level of 6 pursuant to USSG § 2B1.1(a)(2); | +6 |
| (ii) | a 20-level increase pursuant to USSG § 2B1.1(b)(1)(K) for losses greater than $9,500,000 but not more than $25,000,000; and | +20 |
| (iii) | A two-level increase pursuant to USSG § 3B1.3 for abuse of position of trust or use of special skill. | +2 |

---

[7] *In the matter of David Kagel*, 94-J-1858 (Cal. State Bar Apr. 1997).
[8] *In the matter of David Kagel*, 09-O-15403-PEM at pp. 10 (Cal. State Bar Mar. 12, 2012).
[9] *In the matter of David Kagel*, SBC-22-O-30016 (Cal. State Bar Jan. 24, 2022); *In re David Kagel on Discipline*, S278235 (Cal. S. Ct. Mar. 22, 2023).

In addition, the government agrees with the USPO calculation in the PSR that the following sentencing enhancements and adjustments to the offense level are applicable:

| | | |
|---|---|---|
| (iv) | a six-level increase pursuant to USSG § 2B1.1(b)(2)(C) for an offense that resulted in substantial financial hardship to 25 or more victims; and | +6 |
| (v) | a three-level decrease pursuant to USSG § 3E1.1 for clear demonstration of acceptance of responsibility of the offense and timely entering a plea of guilty. | -3 |

**Total Offense Level:**                         **31**

## IV.   SECTION 3553(a) FACTORS

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing identified in 18 U.S.C. § 3553(a). *United States v. Rita*, 551 U.S. 338, 348 (2007). Although the Guidelines are not binding, they "reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives." *Id*. at 350.

Under 18 U.S.C. § 3553(a)(1), the Court should consider the nature and circumstances of the offense and the history and characteristics of the defendant. Furthermore, the Court should consider the need for the sentence imposed to: (i) reflect the seriousness of the offense, (ii) promote respect for the law, (iii) provide just punishment, (iv) afford adequate deterrence, (v) protect the public, and (vi) avoid unwarranted sentence disparities. (18 U.S.C. § 3553(a)(2) and (6).)

## V.   GOVERNMENT'S SENTENCING RECOMMENDATION

   A. <u>The Government Recommends a Sentence of Five Years' Probation with a Condition Home Confinement</u>

Kagel's guideline imprisonment range is 108 months to 135 months and is capped by a 60-month statutory maximum sentence. (PSR at ¶ 141.) Notwithstanding the guideline imprisonment range, the government agrees with the USPO's recommendation for a

downward variance and imposition of a non-guideline sentence based on the § 3553(a) factors discussed below including defendant's age, reported health, and a low likelihood of recidivism. (PSR at ¶ 166.) According to the PSR, defendant is elderly and infirm both mentally and physically. He is an 86-year-old man, who is diagnosed with multiple ailments that would substantially diminish his ability to recidivate. Thus, the government concurs with the USPO and recommends the Court sentence Kagel to (i) 5 years' probation; (ii) order Kagel to pay restitution in the amount of $13,949,435.71; and (iii) order a mandatory special assessment of $100.

In addition, considering the seriousness of Kagel's crimes in light of the factors under § 3553(a)(2), the government recommends that, as an alternative to incarceration, the Court impose as a condition of probation that defendant remain at his place of residence during nonworking hours (*i.e.*, home confinement). *See* 18 U.S.C. § 3563(b)(19)[10]; *see also United States v. Lorenzini*, 71 F.3d 1489, 1491 fn. 1 (9th Cir. 1995) (defendant pleaded guilty to one count of bank fraud and was sentenced to 5 years' probation that included a condition of home confinement, supported in part because defendant was not the organizer of the conspiracy and had legitimate health problems).

The government does not recommend that the Court require that compliance be

---

[10]   Title 18, United States Code, Section 3563(b)(19) states:

(b) Discretionary Conditions.—The court may provide, as further conditions of a sentence of probation, to the extent that such conditions are reasonably related to the factors set forth in section 3553(a)(1) and (a)(2) and to the extent that such conditions involve only such deprivations of liberty or property as are reasonably necessary for the purposes indicated in section 3553(a)(2), that the defendant—…(19) remain at his place of residence during nonworking hours and, if the court finds it appropriate, that compliance with this condition be monitored by telephonic or electronic signaling devices, except that a condition under this paragraph may be imposed only as an alternative to incarceration.…

monitored by telephonic or electronic signaling devices. The government further recommends that the Court's judgment order that defendant be permitted to leave his residence to perform a job or job-related activities (if applicable), to receive medical treatment, to attend religious activities, and for such other reasons pre-approved by the Court or the U.S. Probation Office. *See also, e.g.*, 18 U.S.C. § 3624(g)(2) (an analogous statute listing certain exceptions to the requirement to remain at their residence for prerelease prisoners serving a term of imprisonment under home confinement).

B. Relevant Factors

Considering the relevant 18 U.S.C. § 3553(a) factors, a below guidelines sentence of 5 years' probation with a condition of home confinement as an alternative to incarceration is sufficient, but not greater than necessary, to achieve the goals of sentencing.

1. *Nature and Circumstances of the Offense and History of the Defendant (18 U.S.C. § 3553(a)(1))*

The nature and circumstances of the offense, including Kagel's history of fraudulent conduct, weigh in favor of a statutory maximum sentence of 60 months' imprisonment, which is approximately half the advisory guidelines range of 108 to 135 months. As noted by the USPO, "the egregious actions of this defendant should not be minimized or understated …." (PSR at ¶ 165.) Kagel personally defrauded at least two dozen victims of millions of dollars. The conspiracy in which Kagel played an integral part impacted many more: at least 177 victims, who have reported losses of more than $18 million. (PSR at ¶ 70.) Kagel not only defrauded victims of their money, but he robbed them of their ability to trust. Kagel preyed on his victims' willingness to believe that, as an attorney, Kagel would conduct himself with integrity and honesty. By abusing his position of trust, Kagel destroyed many victims' ability to place their trust in others. This is a significant

consequence of Kagel's illegal actions, and the Court should not overlook it or minimize its impact.

Furthermore, Kagel's involvement in this charged scheme is just the latest in a long line of fraud and dishonesty to serve Kagel's own greed.  The record, described above and in the PSR, demonstrates from 1994 onward a recurring pattern of fraud and deceit aimed at picking the pockets of those who trusted Kagel all in the service of lining his own pockets.

    2. *Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))*

Defendant has no prior criminal convictions, is 86 years old, and has reported to the USPO that he is in ailing health.  (*See* PSR at ¶ 164.)  Notwithstanding the seriousness of Kagel's crimes and the other § 3553(a) factors that weigh heavily in favor of a statutory maximum sentence of 60 months' imprisonment, the government agrees with the USPO that defendant's age and health alone justify a downward variance and imposition of a non-guideline sentence of five years' probation.  (PSR at ¶ 159.)  The government, however, also recommends home confinement as a condition of probation as sufficient, but not greater than necessary, to reflect the purposes of sentencing identified in 18 U.S.C. § 3553(a).

    3. *Seriousness of the Offense, Respect for the Law, and Just Punishment (18 U.S.C. § 3553(a)(2)(A))*

As legal jurists of antiquity rightly observed: *culpae poena par esto*. (Let the punishment be equal to the crime.)[11]  A substantial sentence is needed in this case to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.  As described above, Kagel's conduct was egregious, he continued to personally engage in overt acts in furtherance of the conspiracy for at least four years (from 2018 to 2021), and he was personally responsible for inflicting immense financial and emotional

---

[11] LEGAL MAXIMS at 439, Black's Law Dictionary (12th ed. 2024).

13

harm on his victims. Specifically, many victims reported substantial impacts such as: (i) loss of their retirement and life savings, (ii) postponement of retirement, (iii) refinancing homes, (iv) use of credit cards to pay for living expenses, (v) bankruptcy, (vi) an inability to support their children and/or aging parents, (vii) difficulty paying monthly expenses, and (viii) perhaps most devastatingly, damage to their personal relationships and having lost the trust of their partners and loved ones. (PSR at ¶ 74.) Kagel's victims have lost trust in others and themselves; they suffer from anger, anxiety, depression, fear and guilt. *Id.* Several victims also reported suicidal thoughts because of Kagel and Saffron's fraud. The seriousness of the offense is significant. Kagel repeatedly demonstrated his utter disrespect for the law, disrespect for the legal profession, and disrespect for our system of justice. A substantial sentence would be a just and deserving punishment.

### 4. *Affording Adequate Deterrence to Crime (18 U.S.C. § 3553(a)(2)(B))*

There are compelling reasons in this case to impose a significant sentence to provide for general deterrence to others, particularly others in a position of trust, who may consider using their position to defraud their clients or the public. As described above, Kagel lied to potential investors and used his position as an attorney to induce their investments, he lied to the CFTC in the course of its investigation, he negotiated in bad faith to settle victims' claims against him, he lied to a district court in connection with the CFTC's litigation against Saffron, and he continued to recruit new victims and launder Saffron's money while under the scrutiny of the CFTC and the jurisdiction of the district court. Kagel's conduct is egregious and outrageous. Thus, a significant sentence is necessary to send a message, loud and clear, that behavior like Kagel's will not be tolerated in a civil society that values the rule of law.

C. <u>Supervised Release, Fine, Restitution, Forfeiture, and Mandatory Special Assessment</u>

The government concurs with the USPO's assessment that defendant is (i) eligible for supervised release of not more than three years; (ii) required to pay restitution in the amount of $13,949,435.71; and (iii) subject to a mandatory special assessment of $100. (PSR at ¶¶ 145-150.) The government takes no position on the imposition of a fine and is not presently seeking forfeiture of defendant's assets.

VI.   **CONCLUSION**

For the above reasons, the government respectfully requests that the Court sentence defendant David Kagel as follows: (i) a sentence of 5 years' probation, including a condition of home confinement; (ii) restitution in the amount of $13,949,435.71; and (iii) a special assessment of $100.

Respectfully submitted,

GLENN S. LEON
Chief, Fraud Section
Criminal Division, U.S. Department of Justice

　　*/s/ Theodore M. Kneller*　　　　　　　　　　September 30, 2024
THEODORE M. KNELLER                                                    Date
Trial Attorney, Fraud Section
Criminal Division, U.S. Department of Justice
D.C. Bar No. 978680
1400 New York Avenue, NW
Washington, DC 20530
Telephone:    (202) 514-5799
E-mail:         Theodore.Kneller@usdoj.gov